IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

UNITED STATES OF AMERICA,

              Plaintiff,        No: 1:26mj7

 vs.

DJUAN JAMAR ORR,

              Defendant.


Before:

                    THE HONORABLE RAY KENT
                    U.S. Magistrate Judge
                    Grand Rapids, Michigan
                Thursday, January 15, 2026
      Detention and Preliminary Hearing Proceedings

APPEARANCES:

             MR. TIMOTHY VERHEY, U.S. ATTORNEY
             By:  MS. ALEXIS MARIE SANFORD
             330 Ionia Avenue, NW
             P.O. Box 208
             Grand Rapids, MI 49501-0208
             (616) 456-2404

                    On behalf of the Plaintiff;

             FEDERAL PUBLIC DEFENDER
             By:  MR. MARCUS J. MILLER
             50 Louis Street, NW, Suite 300
             Grand Rapids, MI 49503-2633
             (616) 742-7420

                    On behalf of the Defendant.


TRANSCRIBED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR

02/12/2026

3:00 p.m.

THE CLERK:  The United States District Court for the Western District of Michigan is now in session.  The Honorable Ray Kent, United States Magistrate Judge, presiding.  Please be seated.

THE COURT:  This is 26mj7, United States versus Djuan Orr.  Ms. Sanford on behalf of the United States.  Mr. Miller on behalf of Mr. Orr.  Two matters set for hearing, a preliminary hearing and a bond hearing.  The preliminary hearing its the government's burden to establish probable cause to believe that Mr. Orr committed the crime alleged in the criminal complaint.  In the bond hearing, the burden is on the government to prove either -- that Mr. Orr is a risk of nonappearance.  The government's burden on that issue is something we call a preponderance of the evidence, and requires just slightly more evidence suggesting that a defendant is a risk of nonappearance than evidence to the contrary.

And the other issue is danger to the community.  The government's burden of proof on that issue is a heavier one.  It's something we call clear and convincing evidence and requires more evidence by the government.

At least in the bond hearing, the rules of evidence do not apply, and things like hearsay evidence, which would not be admissible at trial, are admissible.  Even if the government

collected evidence against you illegally, and I don't have any reason to believe that it did, but even if it did, that evidence would probably be admissible for our purposes this afternoon and at least given with respect to the bond hearing, neither the government nor you have to produce evidence by putting witnesses on the witness stand.  You can do it instead using a procedure we call a proffer.  What that means is the lawyers tell me facts which I then consider as if they had come from a witness on the witness stand.

Ms. Sanford, the burden of proof is on the government. The floor is yours.

MS. SANFORD:  Thank you, Your Honor.  With the Court's indulgence, I plan to illicit evidence both that goes to the complaint and to dangerousness during the hearing.

THE COURT:  That's fine.  Yeah.  Absolutely.

MS. SANFORD:  Then the government calls ATF Special Agent Dustin Hurt.

DUSTIN HURT, GOVERNMENT

having been first duly sworn, testified as follows:

(Witness sworn, 3:03 P.M.)

DIRECT EXAMINATION

BY MS. SANFORD:

Q    Where are you employed?

A    I am a special agent with the Bureau of Alcoholic, Tobacco Firearms & Explosives.

Q    How long have you worked for ATF?

A    Since October of 2018.

Q    And you have been assigned to the investigation into Mr. Orr?

A    That's correct.

Q    All right.  In fact, you have submitted a complaint already to this Court regarding his conduct?

A    Yes.  I did.

Q    And in that complaint he is accused of being in possession of a machine gun?

A    Correct.

Q    What specific type of gun is it that Djuan Orr possessed?

A    It's a Glock model 23 .40 caliber pistol that's manufactured as semiautomatic, but on the back of it is a machine gun conversion device which is attached to the rear of the slide, commonly referred to as a Glock switch or a switch or a button, which causes that firearm to fire fully auto.

Q    All right.  When was the firearm seized?

A    January 9th.  The evening of January 9th.

Q    Of this year?

A    Correct.

Q    About six days ago?

A    Correct.

Q    And from what address?

A    It would have been ▮▮▮▮▮▮▮▮▮▮▮▮ in Lansing.

Q    I'm sorry.  ████, is that what you said?

A    Yes.

Q    Okay.  This is an investigation that was begun by Lansing Police Department?

A    Correct.

Q    And you have had a chance to review their reports and some of the investigative materials they have collected?

A    Yes.  I have.

Q    And they were investigating some retaliatory shootings between gangs in the Lansing area?

A    That's correct.

Q    All right.  And were they conducting surveillance on January 9th?

A    Yes.

Q    Was it related to those shootings?

A    Yes.  It was.

Q    Where were they doing that surveillance?

A    At that same address on Starlight Lane.

Q    All right.  And did Mr. Orr have any ties to that address on Starlight Lane?

A    Yes.  He did.

Q    What are his ties to that?

A    He had been previously arrested there for a tether violation, and he was a known associate and stayed with Cedric Jackson, who lived there on occasion.

Q    He was arrested from that residence on September 8th of 2025?

A    Yes.

Q    Ultimately that residence ended up being searched on January 9th?

A    Yes.

Q    And property associated with Mr. Orr was found in the residence as well?

A    Yes.

Q    Okay.  We are going to get to that.  Let's go back to the idea that they were doing surveillance at this house on Starlight.  While Lansing Police officers were doing surveillance, did they see Mr. Orr?

A    Yes.

Q    Where did they see him?

A    They observed him exit the residence and get into a vehicle.

Q    Was it -- what vehicle did he get into?

A    It was a white Buick Enclave.

Q    Was he the only one who got in the vehicle?

A    No.

Q    Who else got in?

A    Cedric Jackson as the driver, and Achaius Jackson was the front seat passenger.

Q    And where did the vehicle go?

A    It went to Dunham's, which is on the east side of Lansing in what's commonly referred to as Frandor.

Q    When the vehicle was at Dunham's did anyone get out?

A    Yes.

Q    Who?

A    Achaius Jackson and Mr. Orr.

Q    Where did they go?

A    They went into Dunham's.

Q    Some time later in this investigation law enforcement obtained surveillance from inside Dunham's?

A    Yes.

Q    And what did that show, particularly as to Mr. Orr inside the store?

A    There was video where Mr. Orr can be seen picking up .40 caliber ammunition and putting it in his pocket as well as meeting with a Dunham's associate to get what was later discovered in the vehicle, which was a foregrip that goes on the front portion of the pistol.

Q    And after they completed their errands in Dunham's, did Mr. Jackson and Mr. Orr return to the Enclave?

A    Yes.

Q    What happened next?

A    As they were believed to be going back to the Starlight residence, the surveillance team and investigators on scene were told that a search warrant for Cedric Jackson's person,

the Buick Enclave, and the residence on Starlight had been signed by a 54A judge in Lansing.

Q    So they had a state warrant for the car, Cedric Jackson, and the house?

A    Correct.

Q    Did officers then stop the car?

A    Yes.

Q    Who was in the backseat?

A    Djuan Orr.

Q    Okay.  And what else was in the backseat?

A    .40 caliber ammunition with a Dunham's sticker on it, price tag.

Q    Okay.  You said, also, that at some point the stolen foregrip was also found in the Enclave?

A    That was located in there.  Yes.

Q    Okay.  After the traffic stop and the search of the car and I am assuming the arrest of the occupants --

A    Yes.

Q    -- was the house at ████████████████████ searched?

A    Yes.

Q    All right.  Let's talk about what they found related to Mr. Orr first.  In front of you is what has been marked as Government's Exhibit 1.  Are you familiar with this picture?

A    Yes.  I am.

Q    What is depicted in Exhibit 1?

A    That is the Glock model 23 .40 caliber with the machine gun conversion device attached to the rear of the slide with a foregrip on it.

MS. SANFORD:  Move for the admission of Exhibit 1?

THE COURT:  Any objection?

MR. MILLER:  No objection and no objections to the other exhibits.

THE COURT:  All right.  All the exhibits are deemed admitted.

MS. SANFORD:  Thank you.

BY MS. SANFORD:

Q    All right.  You indicate that this firearm has a machine gun conversion device on the back of it?

A    Yes.

Q    And you have described what that is.  Did you test fire this gun?

A    I did.

Q    And what happened when you fired the gun?

A    With one pull of the trigger it shot multiple rounds of ammunition.

Q    So that's considered a fully automatic firearm?

A    Yes, ma'am.

Q    And under federal law that's a machine gun?

A    Correct.

Q    Okay.  You also mentioned it has a foregrip on the front?

A    Yes.

Q    That's what we see attached sort of the below the end of the barrel?

A    That's correct.

Q    And it allows someone to hold this firearm with two hands?

A    Correct.

Q    One on the grip and one on the foregrip?

A    Yes, ma'am.

Q    Why would that be necessary for a handgun?

A    For a handgun it necessarily wouldn't be, but with a machine gun conversion device on it, when it fires full auto, the firearms have a tendency to rise up.  So if you can stabilize it with two hands it would help you stabilize the firearm.

Q    And this foregrip that we see on this firearm is the same type of item that he stole from Dunham's?

A    I don't know if it's the exact brand and make and model, but yes.

Q    Okay.  We claim that this firearm is associated with Mr. Orr.  Have you found images on social media that make -- that led you to that conclusion?

A    Yes.

Q    So looking at Exhibit 2, what do we see here in Exhibit 2?

A    In Exhibit 2 Mr. Orr would be to the left.  In that picture he has a Glock with a machine gun conversion device on it, and

the pistol grip at the time has a purple drap on it, a cover, a removable cover.

Q    Okay.  So that item that's purple is removable in this image?

A    Yes.

Q    And otherwise, based on the characteristics that you can discern here, does it appear to be the same type of gun as in Exhibit 1?

A    It appears so.  Yes.

Q    All right.  And then looking at Exhibit 3.  What is depicted in Exhibit 3.

A    It's an Instagram post, and then you'll see three individuals with a padlock over the top of them, and to the far right is Mr. Orr who is holding a Glock pistol with what appears to be a machine gun conversion device attached to the rear.

Q    The machine gun conversion device is a thing we see sticking out of the gun right above the E on his sweatshirt?

A    That's correct.

Q    And the three men with the padlocks over their heads are they the three men that were arrested from the Enclave?

A    That's correct.

Q    This was posted on social media after that arrest?

A    Correct.

Q    And in fact, it says, free da 8 at the bottom, is that

correct?

A     Yes.  It does.

Q     And then finally, Exhibit 4, it's a little blurry because I tried to blow it up, but what is depicted in Exhibit 4?

A     That is another Instagram post where you can see Mr. Orr holding a Glock pistol with a machine gun conversion device attached to the rear of the slide with a caption that says love brudda.

Q     Okay.  This is actually a screen shot from a video, Exhibit 4?

A     Yes.

Q     Okay.  So in all of these images does that seem to be the same .40 caliber Glock handgun that was seized from the Starlight residence?

A     It has the same characteristics.  Yes.

Q     And in all of those, Mr. Orr is the person holding that item?

A     Correct.

Q     And in all of those items it appears to have the switch affixed to it?

A     Correct.

Q     How do you know that Mr. Orr was aware of what -- that there was a switch on the gun?

A     Mr. Orr has many rap songs that he's put out where he commonly refers to switches or buttons as they call them

sometimes.  In many of his rap songs he even makes the noise of a full auto and what it sounds like.

Q    What does a full auto -- what noise does he make?

A    Something along the lines of (Witness making noise).

Q    Okay.  Sounded sort of rapid fire?

A    Yeah.

Q    Okay.  In fact, one of the video -- one of his rap songs we quoted in the complaint, he talks about a Glock 23 with a button on it?

A    That's correct.

Q    And a button is a slang term for a machine gun conversion device?

A    Yes, ma'am.

Q    After Mr. Orr was in custody, was he aloud to make calls from the Ingham County Jail?

A    Yes.  He was.

Q    Were those calls recorded?

A    Yes.

Q    And is he told at the outset of the calls that they are being recorded?

A    In every single call.  Yes.

Q    Were you able to review some of those jail calls?

A    I was.

Q    And one of them he is talking initially to his girlfriend, is that right?

A    Correct.

Q    And then he switches to someone else.  Who is he talking to?

A    His mother.

Q    And does she ask him why the feds have an interest in his case?

A    She did.

Q    And what does he tell her?

A    He told his mom that the thing that they found in that house was the thing on the back is the reason that the feds picked it up.

Q    So he doesn't say it directly, but the thing that they found in that house with the thing on the back could be the gun that they found in the house with the switch on the back?

A    In my experience, yes.

Q    Does he also at least allude to the fact that he can be linked to that item through photographs?

A    He did.

Q    So the firearm that we think is associated with him in Exhibit 1 wasn't the only thing that came out of that Starlight house linked to him?

A    No.  It was not.

Q    There were some black Nike shoes with red accents found in the basement?

A    Correct.

Q    Related to this ongoing investigation, had officers reviewed footage of a Quality Inn hotel from January 3rd and fourth of this year?

A    Yes.

Q    And that video showed Mr. Orr and four others walking through the lobby of the hotel?

A    Correct.

Q    And in that video is Mr. Orr wearing those black Nike shoes with red accents?

A    Yes, ma'am.

Q    Okay.  There was also an item that I just learned about today near the shoes, a pro pad?

A    Correct.

Q    What is a pro pad?

A    A pro pad is a device that car dealers use to program keys that have become available for purchase on things like platforms like Amazon and things like that.

Q    So it's a small sort of computer that you plug into a car?

A    Yes.  You plug it in in the area underneath a glove box, and what it does is it will program that -- a key essentially to a vehicle.

Q    All right.  And was the pro pad found near Mr. Orr's shoes linked to a specific vehicle?

A    Yes.  It was.

Q    What kind of vehicle was it that it was connected to?

A     A maroon Dodge Durango.

Q     Was that maroon Dodge Durango eventually recovered after the residential search?

A     Yes.

Q     Had it been reported stolen?

A     Yes.

Q     And when law enforcement discovered that Durango, it could link that key pad to it?

A     Yes.

Q     And was there some other evidence linking that car to Mr. Orr?

A     Yes.  There was.

Q     And what was that?

A     His bluetooth was connected to the infotainment part of the vehicle.

Q     His cellular -- his cell phone bluetooth had been --

A     Yes.

Q     So we talked about the gun and the other items in the house that are linked to Mr. Orr.  That Glock model 23 .40 caliber pistol wasn't the only firearm in that residence?

A     It was not.

Q     Where specifically in the house was the Glock found, the Glock .40 caliber?

A     In the basement bathroom.

Q     All right.  How many other guns were found in the house?

A    Four others.  Five total.

Q    Where were those four other guns?

A    With it.  They were essentially packaged kind of together.

Q    They were all in that basement bathroom together?

A    Yes.

Q    Those other guns were two Taurus 9mms?

A    Yes.

Q    A Glock 19, Gen 5 9mm?

A    Correct.

Q    That one had an extended magazine and a laser on it?

A    Yes.

Q    And a Glock 26 Gen 4 9mm?

A    Correct.

Q    There was also a 9mm ammunition box in the basement bathroom?

A    Correct.

Q    There was an empty 9mm magazine on a bar in that basement?

A    Yes.

Q    And there was a Glock 9mm magazine on a TV stand in the basement?

A    Yes.

Q    And then finally, a Glock .40 caliber magazine that was loaded also on the TV stand in the basement?

A    Correct.

Q    Once the machine gun -- actually, once all of these guns

were seized on January 9th, were they submitted for NIBIN comparison?

A    Yes.  They were.

Q    What is NIBIN comparison?

A    NIBIN is the National Integrated Ballistics Information Network, and what that means is every time a gun is fired and there is casings left on a scene, they get input into this NIBIN program, and once the gun is recovered, they can match that gun to all the other different scenes where casings were delivered previously.

Q    Okay.

A    It's like a fingerprint for a casing of a shot.

Q    So specifically with this Glock model 23, you fired a test shot, is that right?

A    Two.  Yes.

Q    And submitted them so that they could be compared to other casings that had been picked up from shooting scenes?

A    Correct.

Q    And the gun had been linked to at least two other shootings?

A    Yes.

Q    All right.  I want to talk about a series of shootings. The first one happened on January 4th, 2026?

A    Correct.

Q    And where was the shooting on January 4th, the first one?

A    It was on ███████████████.

Q    Okay.  That's in Lansing?

A    Yes, ma'am.

Q    And what time roughly on January 4th was this shooting?

A    Some time around 8:00 in the morning.

Q    Might this one have been earlier than that?  Sorry.  I know I am asking about a bunch of shootings.

A    I think this one was at 5:00.

Q    Okay.  So this video is from a neighbor around that time, is that right?

A    That's correct.

Q    And it's indicating this is about 5:47 a.m.?

A    That's correct.

Q    This is Exhibit 5.  So after the shots are fired, police responded to the neighborhood?

A    Correct.

Q    They canvassed the neighborhood?

A    Yes.

Q    Did neighbors report hearing shots?

A    Yes.

Q    And some neighbors provided video that they had captured with ring cameras or surveillance cameras or whatever they happened to have?

A    Correct.

Q    This is just one of the videos that Lansing Police

Department obtained pertinent to the shooting?

A    Yes.  Just one.

MS. SANFORD:  All right.  At this time, Your Honor, I am going to play this video for the Court.

BY MS. SANFORD:

Q    Ultimately we are going to see a group of four men walk from the left side of the screen to the right side?

A    Yes.  They are walking southbound on Beal.

Q    What was that sound that we just heard?

A    Gunshots.

Q    And now we see them running northbound?

A    Correct.

Q    You said that this was just one of the videos that was found.  A neighbor around the corner provided video that showed four men parking and exiting a white SUV?

A    That's correct.

Q    What kind of vehicle was that later determined to be?

A    A Buick Enclave.

Q    And Mr. Orr and the Jacksons were arrested from a white Buick Enclave on January 9th?

A    That's correct.

Q    Who was believed to be the target of this shooting?

A    A rival gang.

Q    All right.  The resident at ████████ used to have a son that lived with her that's involved in a rival gang?

A    Correct.

Q    And evidence was collected when police responded to the scene of this shooting?

A    Yes.

Q    There was a bullet fragment in the downstairs bedroom?

A    Yes.

Q    16 9mm casings?

A    Correct.

Q    There were no .40 caliber casings at this particular shooting?

A    There were not.

Q    Okay.  But the 9mm casings were connected to the gun seized from the Starlight residence?

A    That's correct.

Q    There was a second shooting later that very same day?

A    Yes.

Q    And law enforcement believes it involved the same group of men?

A    Yes.

Q    Where did that shooting occur?

A    Near the corner of Argyll and Sunderland in the City of Lansing.

Q    And this was about 8:00 in the morning?

A    8:00, 8:30, yeah.

Q    Okay.  And can you just tell the Court a little bit about

what happened in that shooting incident?

A    Yes.  There were multiple individuals, four individuals that were standing near the front of a car, and a woman and her husband, that's what they told us, left to get coffee, and as they were leaving they thought somebody was having car trouble. As they were pulling up to see if they needed help, the -- it ended up being all four males opened fire on the vehicle striking the woman in the car two times, and she advised that she had multiple different lasers coming from a couple of the guns.

Q    Law enforcement responded to the scene of that shooting?

A    Yes.

Q    The shooters were gone by that point?

A    Correct.

Q    But they collected shell casings?

A    Yes.

Q    Eighteen 9mm shell casings?

A    Correct.

Q    And sixteen .40 caliber?

A    Correct.

Q    NIBIN linked those .40 caliber casings to the gun in Exhibit 1?

A    Yes.

Q    All right.  So those were the two shootings on January 4th. Now, there was another shooting again on January 9th?

A    Correct.

Q    This was again at ████████████?

A    Yes.

Q    So the same location as the first shooting we talked about?

A    Correct.

Q    And this was at about 8:00 in the morning?

A    Yes.

Q    And again, this was captured on a neighbor's surveillance camera?

A    Yes.

Q    I am going to play Exhibit 6.  We are going to see a vehicle pull up.  What kind of vehicle is it?

A    It's a maroon Dodge Durango.

Q    And who gets out of the driver's seat?

A    Mr. Orr.

        MS. SANFORD:  Thank you.  I have no further questions.

        THE COURT:  All right.  Mr. Miller, cross examination?

        MR. MILLER:  Yes, Your Honor.

                CROSS EXAMINATION

  BY MR. MILLER:

Q    You said it on direct, but I just was trying to write everything down, couldn't write everything quick enough.  Where did you say that you recovered the Glock 23 in Exhibit 1?

A    It was in the basement bathroom.  It was with four other firearms.

Q    They were altogether?

A    Yes.

Q    Okay.

A    Yes.

Q    And did you happen to know -- so on direct you mentioned that Mr. Orr was connected to that residence?

A    Yes.

Q    Did you happen to know whether he lived there?

A    Not personally.  No.

Q    Okay.  And we talked about -- you talk about three shootings.

A    Yes.

Q    The first one on, I believe it was -- what date was that? January 4th it looks like?

A    January 4th at 1825 Beal.

Q    Okay.  And that one you are not -- fair to -- do you have any knowledge of who shot those bullets that were -- that you could hear in the background?

A    I do not.

Q    Okay.  With regard to that January 9th shooting, the one with the maroon Dodge Durango.

A    Yes.

            MR. MILLER:  Could we play that one more time?  Sorry.

            MS. SANFORD:  I can.  It will just take me a second.

            MR. MILLER:  This was resuming where you had left off.

There we go.

MS. SANFORD:  Feel free to pause or move it however you want.

MR. MILLER:  All right.  Thank you.

BY MR. MILLER:

Q   So on direct you testified that the driver was Mr. Orr?

A   It's believed to be him based on stature.

Q   So that's all you are basing it off of is his stature, right?

A   Correct.

Q   So you don't see a face, right?

A   No.

MR. MILLER:  Okay.  No further questions, Your Honor.

THE COURT:  Okay.  Ms. Sanford, redirect?

MS. SANFORD:  No.  Thank you, Your Honor.

THE COURT:  All right.  Officer Hurt you may step down, please.

(Witness excused, 3:27 p.m.)

MS. SANFORD:  I have no further proofs for purposes of today's hearing.

THE COURT:  Okay.

MS. SANFORD:  Thank you.

THE COURT:  Mr. Miller, evidence?

MR. MILLER:  Yes, Your Honor.  Just in the form of proffer.

THE COURT:  Okay.

MR. MILLER:  And this would be for the detention.

THE COURT:  All right.

MR. MILLER:  Mr. Orr works unofficially as a mover for -- he works for a friend who I think is employed by U -- Uhaul.  He makes about -- Mr. Orr makes about $700 a week.

The pretrial report indicated that his mother is single and she is currently living in a homeless shelter, and Mr. Orr has two other siblings.  They are 15 and -- or about to turn 15, and one is, I think, five, and Mr. Orr helps provide for them.  He helps pay for their food, clothing, transportation to school, and he helps pay for things like birthday gifts, which one of his sisters is turning 15.

I believe I did not see any failure to appears in his record, and I could be -- I didn't see any.  He also -- the report notes he is currently enrolled, I believe, getting his GED.  He goes to classes twice a week, both on-line and in person, and he is almost done with the program and I think he only has to take the post test.

His sisters live with his grandpa, and he would live with his grandpa as well if allowed to get out.  His grandpa has -- our office has also talked to his grandpa who is willing to let him stay there.  His sisters live with the grandpa while they are in Lansing, and the sisters -- his sisters, their father -- it's a different father from Mr. Orr's father -- the

siblings' father is in federal prison.  So Mr. Orr, like I said, helps take care of them.

Nothing further.

THE COURT:  All right.  Mr. Miller, how is he going to go and live with his family if there is a felony probation violation warrant issued by MDOC outstanding statewide pickup and no bond?  He is not going to get out of this building not in custody.

MR. MILLER:  Your Honor, that might be true.  I mean, there is always the chance that the state would at a further hearing allow him to be on bond.  I'll note, you know, he was on bond -- he is on bond for one of his cases currently, if there is a pending state case right now.  When I met him he had the electronic monitoring on his ankle so there is always the chance that he gets out.  That's what I would say.

THE COURT:  Okay.  Thank you.

The Court's consideration of bond begins with the Eighth Amendment to the United States Constitution, which prohibits excessive bail.  The Eighth Amendment's protections are made statute in the Bail Reform Act beginning at 18 United States Code § 3141, § 3142 of which requires the Court to release a Defendant on bond unless the Court concludes that there is no condition or combination of conditions that will reasonably assure the Defendant's appearance and the safety of the community.

Certainly federal crimes give rise to a presumption of detention.  This is not one of them.

§ 3142(g) of the act lays out the specific factors I am to consider in reaching my decision, including whether the crime charged involves violence or drug dealing.  The crime as charged does not involve violence.  Obviously, it doesn't involve drug dealing.

Second, the weight of the evidence against the Defendant.  I would say the weight of the Defendant -- of the evidence against Mr. Orr is heavy.  There are photographs of him holding a pistol with a machine gun conversion device attached.

MR. MILLER:  Your Honor, I -- may I say something real quick?  The weight of the evidence goes towards the weight of his dangerousness, not to the crime.

THE COURT:  I have moved onto the weight of the evidence from the nature of the crime, so I don't know what you are saying.  Explain to me your position.

MR. MILLER:  There is a Sixth Circuit opinion, United States versus Stone, that says that the weight of the evidence under 3142(g)(2) I believe --

THE COURT:  Yup.

MR. MILLER:  -- goes towards the weight of the dangerousness.  It doesn't go towards the likelihood of him being convicted.

THE COURT:  Okay.

MR. MILLER:  So I just --

THE COURT:  All right.  Well, take my comments as editorial comments then.

I would say the weight of the evidence is heavy. There are, at least in my hand, three pictures, which certainly to me appear to depict Mr. Orr holding a pistol with a machine gun conversion device attached.

On the question of dangerousness, I can't think of many things more dangerous to our community than folks out there with machine guns, particularly when they are engaged in gang warfare with other members of their community.

It's not hypothetical.  I see it all too often sitting right here in this -- on this bench, that people all over West Michigan are getting killed in gang wars, and some of them by pistols with machine gun conversion devices.  The lawyers will be sick of me -- hearing this story, but I had a case recently where a grandmother was baby sitting her seven year old granddaughter.  They were at home.  It was late at night. Grandma was downstairs watching TV.  The baby was upstairs in bed.  A car pulled up out front and they unloaded 70 rounds into the house.  The little girl was struck twice, once in the leg, once in the abdomen.  Thank God she survived.  They were able to save her, and the last I heard she was recovering.

But that's what machine guns in our community do for

us.  Innocent children get shot.  And I am sure nobody was intending to shoot that baby.  They were looking for the woman's son, a grown son, and you are not, in my judgment, fully grown, but someone about your age, and they didn't care who was in the house.  They just were going to empty their guns into that house.  So it was incredibly dangerous to the community to have machine guns out there.

Other factors I consider include the history and characteristics of the Defendant, physical and mental condition, family ties, employment, finances, community ties, history of drug and alcohol abuse.

Mr. Orr is 19, born in Dallas, Texas, relocated to Lansing, Michigan, as an infant.

As Mr. Miller said, his mom and three other children, minor children reside in Lansing.  Unfortunately apparently they are staying at a homeless shelter.  I hope that situation works itself out soon for her sake and the kids' sake.  He has lived with his grandparents on and off.

And I would say for the record, you know, if the police have video of Mr. Orr shooting -- I don't know how many rounds were fired in that second shooting -- into some house, other people in Lansing know that, too, and know who did it, and they'll be looking, if history is any indication, for revenge, and that means, you know, finding Mr. Orr and/or finding the other folks they believe are responsible and

shooting back.  So, you know, if you go home to your grandma and grandpa and their house, you are going to be putting them in danger.

Mr. Orr is single.  No kids.  Does not have a U.S. passport.  Has never traveled outside the United States.  Those are issues that go to whether he would flee the country if I released him on bond.  There is zero chance of him fleeing the country in my estimation.

Apparently, according to Mr. Miller, he's got a job at least part time as a mover.  No real history of employment, although he is only 19.

Mr. Miller says he is contributing some towards his family out of his earnings.  That's good, but he doesn't have much in the way of finances.

Excellent physical health but for the fact apparently some seizures in the past.  None recently.  However, Mr. Orr has been shot in the past in June of 2021, and as Mr. Miller knows, I have something I call the been shot rule, and that is if a Defendant comes before me on a bond hearing and he has previously been shot, my obligation, as I described earlier, is to make sure that a Defendant does not pose a danger to the community.  I consider the Defendant a member of the community. If a Defendant has previously been shot, it suggests to me usually that somebody out there wants the Defendant dead, and if I were to release him, I would be putting him at risk and

thereby putting a member of the community at risk.

Now, in an interesting twist, Mr. Orr apparently shot himself and it wasn't somebody else who shot him.  Does that make me feel better about releasing him?  Absolutely not, because the next time Mr. Orr accidentally shoots himself he may not be so lucky as to find it in his leg, and he could kill himself.  And of course, more importantly, he is carrying a gun around and it's not to shoot himself.  I'm sure he didn't intend that.  It's to shoot other people, and he is -- I have seen video evidence of that on the screen here today.

All right.  Let's see.  Mental health looks pretty good.  He had been diagnosed with ADD as a child, and also post-traumatic stress disorder some time between 14 and 18. I'd love to know if that was related to him shooting himself, but there is not that information available.

Real big drug or substance abuse issue -- issues.  He uses marijuana regularly as do many, many, many people in the State of Michigan.

Other factors I consider include prior criminal history and performance on supervision by other courts.  You know, not surprisingly has a fair bit of a juvenile record, which I usually don't consider.  I would note that in 2021, at age 14, he was found guilty by a juvenile order of guilt carrying a weapon with unlawful intent, and breaking and entering.

Then, also at age 16 in 2023 carrying a concealed weapon.  Found guilty by juvenile order.

2024, at age 17, this is charged in juvenile Court.  I am not sure why.  Generally at 17 you get charged in adult court, but maybe it happened before he turned 17.  Fleeing police and receiving and concealing a stolen vehicle.

His adult history, beginning last year in April, carrying a concealed weapon, and July, this is the case that I was talking about with Mr. Miller a moment ago, he is deferred under a Holmes Youthful Trainee Act agreement on charges of carrying a concealed weapon, assault, resist, obstruct a police officer.

And the fact that he is on supervision with MDOC suggests to me he was convicted, and there was some sort of agreement about what his sentence would be, and it wouldn't be prison, and so he is placed, as long as he abided by conditions, and then, of course, he wouldn't have a felony conviction if he had successfully completed the Holmes Trainee Act conditions, which he did not.  And Mr. Miller, as he must, acknowledges that, in fact, he was on bond when he committed the offenses he is charged with right here in this court.

January of this year we get the assault and weapons charge in Lansing.  I don't know what that's about.  I really don't have any information, although it's believed to be related to this, and then the follow-up charges from the 11th

of January, also Lansing.  The January 9 charge is assault and weapons offenses.  The January 11 charge is weapons discharge at a building.  I assume that's probably based on the video we saw, but I don't know.  Felony firearms, carrying a concealed weapon.

So it's my finding -- oh, and I might say that I have read -- for the record I have read the pretrial services report.  It appears in the Court's record at ECF No. 8.  The following investigation by pretrial services concludes that there is no condition or combination of conditions to reasonably assure the Defendant's appearance and the safety of the community and thus recommends that I detain him.

I would say that the fact that he apparently, allegedly and apparently, based on the evidence I have seen, committed the crimes he is charged with in this case while he is on bond in another case suggests to me that he is not a good candidate for release.

The risk of flight includes not only the risk of whether a Defendant will take off if I release him on bond, but also whether he will abide by the other conditions I impose.  Condition No. 1 on every bond is you can't commit a crime while you are on bond, and apparently Mr. Orr did exactly that in engaging in the conduct which lands him in my courtroom here this afternoon.

The question of danger to the community?  Not even a

close call.  Mr. Orr is an incredible danger to the community. He and his colleagues out there -- I mean, he's got some fascination with guns.  You would hope that would end when you shot yourself, but apparently it didn't, and you continue to carry guns, find guns, get guns, carry guns, and as the video depicts, use guns.  I can't imagine a greater danger to the community than that.

So Mr. Orr, there is no way that I, in good conscience, can release you.  The government has easily met its burden of proving by clear and convincing evidence that Mr. Orr is a danger to the community, and also proved by the much lower standard that he is a risk of nonappearance in that he has apparently committed these crimes while on bond.

Ms. Sanford, anything else from the United States?

MS. SANFORD:  The Court hasn't said anything on the record about the findings regarding probable cause.

THE COURT:  Oh, yeah.  Probable cause.  Probable cause -- thank you for reminding me.  Probable cause requires only a finding that there is a fair probability, based on a totality of the circumstances, to believe that the Defendant has committed the crime of which he has been accused, and as I have said already today, I have in my hand three photographs which appear to depict Mr. Orr holding a pistol with a conversion device.  We saw video.  I couldn't tell -- I mean, I looked particularly at the last video to see if Mr. Orr's

weapon was firing automatically.  I didn't -- I don't know.  It didn't appear to me that it was, but I don't know.  I mean, the closer review of the video might lead to a different conclusion, but there is plenty of evidence to support probable cause on the charges, the possession of a machine gun charge alleged in the complaint.

Mr. Miller, anything else from you?

MR. MILLER:  I recognize this won't change your decision, Your Honor, but I think that he was on bond from the state, like, the January 9th and January 11th.  So I don't believe he -- I don't believe he committed this alleged offense while on bond.

THE COURT:  Oh, okay.  I thought you had told me that.

MR. MILLER:  Sorry.  No.  I might have misspoke.

THE COURT:  Okay.

MR. MILLER:  But what I was trying to say was that he got bond on -- on, you know, the 9th and the 11th, and that in response to your concern about the warrant that I was saying that he's already gotten bond on the pending state cases.

THE COURT:  Yeah.  I guess -- I mean, the 9th would probably be the shooting, the January 9 case out of Lansing, and pretrial services notes it believed to be related to this case, but I am not sure, you know, then, what the January 11 case is about.  But he was certainly on supervision with MDOC on the 2025 concealed weapons Holmes Youthful Trainee Act

deferral case at the time he committed these acts.

All right.  Anything else from either party?

MR. MILLER:  No, Your Honor.

MS. SANFORD:  No.  Thank you, Your Honor.

THE COURT:  All right.  Mr. Orr, you are going to remain in custody until the next hearing in this case, which will probably be --

Do you have a date to go to the grand jury?

MS. SANFORD:  February 3rd.

THE COURT:  February 3rd.  So Ms. Sanford is going to take the evidence and present it to a federal grand jury, which I think we talked about last time you were here, on February 3rd.  The grand jury will review the evidence and make its own decision about whether or not there is probable cause.  If the grand jury finds probable cause, if they agree with me and find probable cause, Ms. Sanford will prepare a document called an indictment, which will set forth any charges the grand jury thinks you should be charged with, and that will take the place of this criminal complaint.  If the grand jury reviews the evidence and disagrees with me and says Kent got it wrong, the charges will be dismissed.

Now, between now and then you will remain in custody, and I think you were at Newaygo last night, so you'll continue there.  Your family probably would like to visit you.  I don't know if you've put them on your visitor list, but you know,

Mr. Miller can describe how to do that for you.

We'll be adjourned.

(Proceeding concluded, 3:49 p.m.)

```
                            INDEX


       Government Witnesses:                    Page

       DUSTIN HURT

         Direct Examination by Ms. Sanford        3
         Cross Examination by Mr. Miller          23



       Exhibits:                              Admitted

       Government's Exhibit 1                      9
         (Photograph of Glock 23)
       Government's Exhibit 2                      9
         (Photograph of Defendant with gun)
       Government's Exhibit 3                      9
         (Photograph of Three Men)
       Government's Exhibit 4                      9
         (Screen shot of Video)
       Government's Exhibit 5                      9
         (Video of 1st Beal Street Shooting)
       Government's Exhibit 6                      9
         (Video of 2nd Beal Street Shooting)
```

C E R T I F I C A T E

I certify that the foregoing is a transcript from the Liberty Court Recording System digital recording of the proceedings in the above-entitled matter to the best of my ability.

/s/ _____

Paul G. Brandell, CSR-4552, RPR, CRR

U.S. District Court Reporter

399 Federal Building

Grand Rapids, MI   49503